UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re
RALPH LEO BRUTSCHE,
            Debtor.                              No. 11-11-13326 SA

### MEMORANDUM OPINION REGARDING
### MOTIONS FOR RELIEF FROM AUTOMATIC STAY
### and MOTION FOR USE OF CASH COLLATERAL

This matter came before the Court for final hearing on the
Motions for Relief from Automatic Stay filed by Los Alamos
National Bank ("LANB" or "Bank")(doc 64) on October 17, 2011 and
the Grevey-Liberman creditors ("GL")(doc 71) on October 20, 2011.
There is a substantial overlap in the collateral of the two
creditors and both motions were handled together.  Debtor filed
objections to both motions on November 7, 2011 (docs 91, 92).

This matter also came before the Court for final hearing on
the Debtor's Amended Motion to Use Cash Collateral filed on
November 2, 2011 (doc 83).  LANB filed an objection on November
11, 2011 (doc 95) and a Supplemental Objection on December 13,
2011 (doc 120).

Debtor is represented by his attorney Arland & Associates,
LLC (William J. Arland III, Edward A. Mazel and James A. Askew).
LANB is represented by its attorney Thuma & Walker, P.C. (Thomas
D. Walker and Samuel I. Roybal).  GL is represented by its
attorney Modrall Sperling Roehl Harris & Sisk, P.A. (Paul Fish).

The Court has subject matter and personal jurisdiction
pursuant to 28 U.S.C. §§ 1334 and 157(b); these are core
proceedings pursuant to 28 U.S.C. § 157(b)(2)(A) and (G); and

this Memorandum Opinion constitutes findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P. For the reasons set forth below, the Court finds that the Motions for Relief from Automatic Stay should be granted and the Motion to Use Cash Collateral should be denied.

**BACKGROUND**

Debtor filed his voluntary individual Chapter 11 petition in this Court on July 22, 2011 ("petition date"). He continues as a Debtor-in-Possession pursuant to 11 U.S.C. § 1107. Debtor is an experienced residential subdivision developer that has worked in the Santa Fe, New Mexico area for at least twenty years of his fifty-plus years in the business. Since 1991 he has worked on a high-end subdivision that lies between the City of Santa Fe and the Santa Fe Ski Basin. Over the years, the project has consisted of different names and phases, e.g. Summit North, South Side, High Summit, but all basically are stages of one grand project under the umbrella name of Santa Fe Summit, or "Summit." Individual lots are secluded and cost from $300,000 to over $1,500,000. Houses in the area of the Summit typically range in value from $700,000 to over $3,000,000. The lots are in the mountains next to Santa Fe at an altitude of approximately 7,500 feet going up to 8,200 feet, which results in a heavily wooded Ponderosa pine-forest environment. The views generally are spectacular. The existing houses in the Summit are mostly owned

-2-

by wealthy individuals including business people and retirees.
Many of the houses are also the owners' second or third homes.
Although Debtor has not built many houses recently, he is known
for building quality, large showcase type homes that cost in the
millions of dollars. He has all the required licensing to build
houses, roads, utilities and subdevelopment infrastructure.
Unfortunately for the Debtor the national economy and Santa Fe's
economy, have hit hard times.

Debtor owns thirty-one lots that are "fully developed,"
meaning that all plats have been approved and filed, all
infrastructure work is done, and utilities are available. He
also owns 18 "partially developed" lots which plats have been
approved and filed, but require about $225,000 in additional
infrastructure work to be fully developed. And, he owns 49
"undeveloped" lots which are neither platted nor approved nor has
infrastructure been done. GL has a first mortgage on the
partially developed and the undeveloped lots. LANB has a second
mortgage behind GL on its collateral and a first mortgage on the
other lots. A few lots free of liens are owned by either Debtor
or his non-filing spouse. Interspersed with Debtor's lots are
lots sold to third parties over the past twenty years; some have
houses[1], others do not[2],

---

[1]Existing homes compete with vacant lots in the current
market. Deposition of Ray Rush, December 14, 2011, p. 41, l. 25
(continued...)

[1](...continued)
- p. 42 l. 17:

    Q.   Are existing homes competition right now for lots
         on which people could build homes?
    A.   Yes.
    Q.   Why?
    A.   Because you can, in today's market, under some
         circumstances, buy a house less expensively than
         you can buy it and build it.
    Q.   Of similar quality?
    A.   Yes.
    Q.   Even in the price range in which you deal?
    A.   Yes.
    Q.   How many homes are presently for sale in the Santa
         Fe market for a listing price of a million dollars
         or more?
    A.   I have no idea.  It's hundreds.  Many hundreds.
    Q.   How many homes are for sale in the Santa Fe market
         that are listed for sale at $2 million or more?
    A.   I think there's 60-plus.


    [2]See Deposition of Dermot Monks, December 13, 2011, p. 33,
l. 6 to p. 35 l. 9:
    Q.   Is there competition for the lots at the Summit,
         outside of the Summit that is, in terms of
         proximity to the city, and  views?
    A.   Yes.
    Q.   Where would you find a competitive product for the
         Summit?
    A.   There would be Sierra del Norte, the Hills of
         Bishops Lodge, Vista Pinada Ancha, Cerros
         Colorados, Monte Sereno became a big competition
         in there.  The Summit's further out in a different
         terrain, but there's always been competition for
         the Summit.  There's a lot of competition.
    Q.   Right now, how many lots do you think are
         available that you would consider to be
         competitive with the Summit?
    A.   There's around 400, or so.
    Q.   Are most of those owned by individuals, not by the
         developer, or is it a mix?
    A.   Most would be individuals.
    Q.   Are most of those actually listed for sale with a
                                          (continued...)

-4-

but both types offer competition to sales by the Debtor.  Debtor
testified that over the years he had acquired 820-830 acres in
High Summit, which he divided up into eight phases of Santa Fe
Summit.  Then he acquired the "Tesuque Creek" tract, which became
a part of Summit, and then he more land in High Summit and the GL
property.  In all, he had 15 "phases" with 283 lots.  He

---

[2](...continued)
        broker?
A.    Yes.
Q.    In fact, is that really what you're talking about,
      is listed lots for sale?
A.    Yes.
Q.    I think we talked about, there are lots listed for
      sale by individual owners in the Summit, aren't
      there?
A.    Yes.
      ...
Q.    (By Mr. Walker) I use the word "premier lots."
      Are there any lots for sale in the Summit you
      would consider to be among the best lots in the
      Summit?
A.    Yes.
Q.    Can you tell me which ones?
A.    Well, I actually have two lots, Lots 4 and 5, of
      High Summit III, that we purchased for 740,000 at
      a discount, and that was around 2005, I believe,
      maybe 2006.  We currently have them listed at
      300,000 and 360, with special bank financing.  And
      little interest.  No contracts.  I have another
      one listed, Lot 26, that was purchased at 250,
      it's been on the market for about nine years at
      395, and it was just lowered to 250.  Then there's
      a variety of other lots for sale in there, and I
      could go through each one, if you like.
Q.    When you say, the lots sole in 2005 for $740,000,
      you mean Lots 4 and 5 each sold of $740,000?
A.    Correct.

testified that 133 were sold[3].

GL filed a foreclosure in the First Judicial District Court, Santa Fe County, State of New Mexico ("State Court") against Debtor and LANB which was pending on the petition date. In that action Debtor had cross-claimed against LANB asserting a variety of causes of action which are generally subsumed under the heading of "lender liability" claims. LANB seeks to terminate the automatic stay to complete its cross-claim foreclosure case against Debtor, including determining the amount of the debt owed, allowing it to foreclose, etc. GL also seeks stay relief. Because the Court is granting stay relief, the Court will not address the merits[4] of the cash collateral motion.

**AUTOMATIC STAY**

When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value

---

[3]Some 52 lots appear to be missing in action. Of the original 283, if 133 were sold, 150 were not sold. Debtor claims ownership of 31 fully developed lots, 18 partially developed lots and 49 undeveloped lots. Debtor claims to own some free and clear as does his wife, but not 52. What exactly was the disposition of those lots (assuming the Court has reached a correct conclusion) is not material for purposes of this decision.

[4]Debtor seeks to use cash collateral to build a model home on a lot on which LANB has a first mortgage. The Court assumes that since the stay is being modified this would no longer be an issue. In oral argument Debtor conceded that he must survive the stay motions to be able to seek to use cash collateral.

-6-

of collateral given by the debtor. The provision of the Code central to the decision of this case is § 362(d), which reads as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> (2) with respect to a stay of an act against property under subsection (a) of this section, if-
> > (A) the debtor does not have an equity in such property; and
> > (B) such property is not necessary to an effective reorganization.

The phrase "adequate protection" in paragraph (1) of the foregoing provision is given further content by § 361 of the Code, which reads in relevant part as follows:

> When adequate protection is required under section 362 ... of this title of an interest of an entity in property, such adequate protection may be provided by-
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title ... results in a decrease in the value of such entity's interest in such property;
> (2) providing to such entity an additional or replacement lien to the extent that such stay ... results in a decrease in the value of such entity's interest in such property; or
> (3) granting such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

<u>United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc.,</u>

-7-

<u>Ltd.</u>, 484 U.S. 365, 369-60 (1988[5]).

Section 362(g) allocates the burden of proof for motions for relief from stay.  It provides:

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--
> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
> (2) the party opposing such relief has the burden of proof on all other issues.

To obtain stay relief under section 362(d)(1) a creditor must show that it holds a secured claim and that the value of the collateral is declining as a result of the stay.  <u>In re Elmira Litho, Inc.</u>, 174 B.R. 892, 902 (Bankr. S.D. N.Y. 1994).  The creditor also needs to prove the decline (or threat of decline[6]) to establish its <u>prima facie</u> case.  <u>Id.</u>  The general rule is that for adequate protection purposes a secured creditor's position as of the petition date is what is protected against deterioration.  <u>In re Armenakis</u>, 406 B.R. 589, 520 (Bankr. S.D. N.Y. 2009) (Citations omitted).  <u>See also</u> <u>In re Reddington/Sunarrow Ltd. P'ship</u>, 119 B.R. 809, 813 (Bankr. D. N.M. 1990)(Same.)

If the creditor establishes its <u>prima facie</u> case the burden

---

[5]The portions of sections 361 and 362 quoted were unaffected by the Bankruptcy Abuse and Consumer Protection Act of 2005, Public Law 109-8, which was signed into law April 20, 2005. <u>Timbers of Inwood</u> therefore remains controlling.

[6]<u>Elmira Litho</u> mentions lack of insurance or a failure to maintain property as examples of a threat.  Those factors do not exist in this case.

shifts to the debtor to prove an absence of "cause" pursuant to
section 362(g)(2). <u>Armenakis</u>, 406 B.R. at 621. A debtor can do
this by showing adequate protection through periodic payments, an
equity cushion, additional or replacement liens, or a good
prospect of reorganization. <u>Id.</u>

Section 362(d)(2) refers to the debtor having equity in
"such property." 11 U.S.C. § 362(d)(2). The majority of courts
therefore look only at the collateral that is the subject of the
motion to determine if the debtor has equity in that collateral;
they do not consider all collateral available to the secured
creditor, such as property pledged by guarantors, to determine
whether "the debtor does not have an equity in such property."
<u>In re SW Boston Hotel Venture LLC</u>, 449 B.R. 156, 177 (Bankr. D.
Mass. 2011). Consideration of other collateral[7] or sources of
payment may be relevant to other issues such as ability to offer
adequate protection or the feasibility of a reorganization. <u>Id.</u>

> Once the movant under § 362(d)(2) establishes that he
> is an undersecured creditor, it is the burden of the
> debtor to establish that the collateral at issue is
> "necessary to an effective reorganization." <u>See</u> §
> 362(g). What this requires is not merely a showing
> that if there is conceivably to be an effective
> reorganization, this property will be needed for it;
> but that the property is essential for an effective
> reorganization <u>that is in prospect</u>. This means, as

---

[7]LANB has possession of an escrow account containing
approximately $395,336, which is subject to Debtor's Motion to
Use Cash Collateral. That $395,336 consists of identifiable
proceeds of the sale of lots secured to LANB, so will be
considered in the determination of equity.

many lower courts, including the en banc court in this
case, have properly said, that there must be "a
reasonable possibility of a successful reorganization
within a reasonable time." [<u>United Savings Ass'n of
Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re
Timbers of Inwood Forest Assoc., Ltd.)</u>], 808 F.2d [363]
at 370-371, and nn. 12-13 [(5th Cir. 1987)], and cases
cited therein.

<u>Timbers of Inwood</u>, 484 U.S. at 375-76 (Emphasis in original).

The language "necessary to an effective reorganization" does

not mean that the debtor must prove the elements of confirmation

at the stay hearing. Rather, the debtor must establish that it

has a proposed plan that has a realistic chance of being

confirmed in a reasonable time and is not patently unconfirmable.

<u>SW Boston Hotel</u>, 449 B.R. at 178.

> Courts have developed a list of requirements that a
> debtor must show in order to meet its burden under the
> second prong of § 362(d):
> 1.   The debtor must be moving meaningfully to propose
> a plan;
> 2.   The plan must provide that the lender's allowed
> secured claim would be valued and payable from the
> debtor's net operating income generated by its property
> or the ability to propose a plan based on the infusion
> of new capital, sale, or other viable means;
> 3.   The plan must have a realistic chance of
> confirmation;
> 4.   Without deciding the issue with the same scrutiny
> as a confirmation hearing, the debtor's proposed plan
> must not be obviously unconfirmable;
> 5.   The reorganization must occur in a reasonable
> period of time. In this regard the factors to look at
> are:
> > a. the negotiations among the parties;
> > b. the amount of time that the debtor has been in
> > possession and operating the business;
> > c. the length of time since the expiration of the
> > exclusivity period.

<u>Id.</u> at 179 (quoting <u>In re Building 62 Ltd. P'ship</u>, 132 B.R. 219,

-10-

222 (Bankr. D. Mass. 1991)).  The list is illustrative but not
exhaustive.  Id.

**FACTS**

The final hearing on these matters took seven days between
December 21, 2011 and January 13, 2012.  Six witnesses testified[8]
and one retook the stand for rebuttal[9].  Also in evidence are the
depositions of Ray Rush (Debtor's former real estate broker) and
Dermot Monk[10], a realtor since 1981 that worked as Debtor's
listing agent at the Summit for eight or nine years.  Parties
made closing arguments on January 19, 2012 and the Court took the
motions under advisement.  The Court has reviewed the testimony
of the witnesses and assessed their credibilities and strengths,
has reviewed the exhibits introduced into evidence and the
designated depositions.  The Court makes the following findings
of fact:

**GENERAL**

---

[8]They are: Janice Brutsche (Debtor's non-filing spouse who
also assists with clerical and sales tasks in his business);
Michael Dry (LANB's expert appraiser); Elizabeth Cavasos (LANB's
Vice President); Dan Castille (LANB's in house counsel); Debtor;
and Paul Vosburgh, C.P.A. (Debtor's Certified Public Accountant).

[9]During the hearing the parties discovered that there were
in fact 31 developed lots, not 35 as originally believed.
Michael Dry explained on rebuttal how this impacted his
appraisal.

[10]The Court dealt with evidentiary objections to the
substance of Mr. Monk's deposition at the close of LANB's
rebuttal case on January 13, 2012.

-11-

The Court found all the witnesses to be credible, honest, direct and forthright.[11] There was considerable agreement about a number of the facts and, by and large, no glaring contradictions in the testimony with the exception of Debtor's conclusions about value versus the conclusions of the other witnesses. Each party presented its case fully.

**EQUITY IN SUMMIT**

**A.  Debt.**

GL filed a proof of claim (claim #3) and attached proper documentation. Debtor has not objected to the proof of claim. Therefore it is deemed allowed. 11 U.S.C. § 502(a). GL's claim is for $4,065,565.53 as of the petition date, secured by lots in the Summit. This amount consists of principal of $3,385,143.23, accrued interest of $566,855.80, late charges of $78,995.46, and attorney's fees, costs, expenses and taxes of $34,571.04. Interest at the rate of 8% has continued to accrue on the principal balance from the petition to date, which is $741.949201 per diem.

LANB filed a proof of claim (claim #7) and attached proper documentation. Debtor has not objected to the proof of claim, although Debtor disputes whether interest on the LANB claim should be calculated currently at a default or non-default rate.

---

[11] Although Messrs Monk and Rush testified by deposition, the Court finds no basis in their testimony to suggest that they were not also credible.

Therefore the claim is deemed allowed (at least for now), subject to the dispute about interest. 11 U.S.C. § 502(a). LANB's claim is for $10,943,117.31, and consists of Claims A and B. Claim A is secured by lots in the Summit. Claim A consists of principal of $8,997,202.13, plus accrued interest at the contract rate of 5.5% of $168,242.10, plus accrued interest at the default rate of 16.0% since default on November 20, 2010 of $962,330.88[12], plus late fees of $12,350.24, plus approximately $20,000 in attorney fees and costs through the petition date, for a total Claim A of $10,160,125.35. Claim B represents the Debtor's personal guarantee of a debt owed LANB by Amusing Investments, LLC, an affiliate of Debtor. Claim B consists of principal of $699,346.63, plus accrued interest at the contract rate of 6.0% of $10,806.23, plus accrued interest at the default rate of 16% since default on December 3, 2010 of $70,816.03, plus late fees of $523.07, plus approximately $1,500 in attorney fees and costs through the petition date for a total Claim B of $782,991.96. Interest at the rate of 16% has continued on the principal balances of both Claims A and B from the petition to date, which are $3,943.979016 and $306.562906 per diem respectively. Claims A and B total $10,943,117.31 as set forth in the claim summary.

---

[12] For purposes of this decision, the Court sees no reason why interest should not be calculated at the default rate from the date the loan became overdue. However, that decision will ultimately finally be made by the State Court.

-13-

Debtor's Amended Schedule D (doc 49, p. 10) lists the New Mexico Taxation and Revenue Department as having a claim for property taxes on lots of $239,307.50 as of the petition date.

LANB's appraisal, Bank exhibit 10 (which is also Debtor exhibit 56), contains a page in its addendum that lists the annual property taxes for the remaining lots and undeveloped land. The appraisal states that the information was obtained from the County of Santa Fe. The addendum shows annual property tax of $126,266. This is $346.920548 per diem. Debtor believed the number was high, but did not come forward with alternative proof. The Court therefore accepts the addendum.

The petition was filed on July 22, 2011. The stay hearing concluded on January 19, 2012, which is 181 days after filing. As of that date, the total debt secured by the Summit was therefore:

| Item | Days | Rate per day | Total 1/19/2012 |
|------|------|--------------|-----------------|
| GL proof of claim | | | $4,065,565.53 |
| GL accruals | 181 | $741.949201 | $134,292.81 |
| LANB proof of claim | | | $10,943,117.31 |
| LANB Claim A accruals | 181 | $3,943.979016 | $713,860.20 |
| LANB Claim B accruals | 181 | $306.562906 | $55,487.89 |
| Tax on petition date | | | $239,307.50 |
| Tax accruals | 181 | $346.920548 | $62,792.62 |
| Total | | $5,339.411671 | $16,214,423.85 |

**B.    Value.**

-14-

## 1. **Debtor's value.**

Under New Mexico law, an owner of real estate is presumed to possess special knowledge by reason of his ownership and is therefore competent to testify as to the value of his own land. Tres Ladrones, Inc. v. Fitch, 127 N.M. 437, 443, 982 P.2d 488, 494, 1999 NMCA 076, {18} (Ct.App.), cert. denied, 127 N.M. 391, 981 P.2d 1209 (1999).  The probative value of an owner's lay opinion is for the fact finder.  State ex rel. State Highway Commission v. Chavez, 80 N.M. 394, 397, 456 P.2d 868, 871 (1969).

Debtor did not provide expert testimony regarding the value of the Summit.  Rather, he relied on his own opinion of value. As to the developed lots, he testified that his opinion of value was based on three factors: 1) his personal history was to sell lots in the Summit for an average of $440,000 per lot; 2) all of the sixty-four sales in the Summit from 2003 to 2007 (including his sales and sales of others, e.g., resales of lots) had an average selling price of $374,000 per lot; and 3) his recognition that LANB's appraiser valued the developed lots at $325,000 but as the owner he believed[13] that the higher amount of $350,000 to $375,000 was more accurate.

As to the partially developed lots, he testified that his opinion of value was based on three factors: 1) the overall sales

---

[13]He provided no explanation or justification for his belief, however, other than the history of sales.

-15-

history for Summit lots averaged from $370,000 to $380,000 per lot; 2) sales he personally made in the Summit averaged $434,000 per lot; and 3) he basically agreed with LANB's appraiser that the current value was $345,000 per lot.

As to the undeveloped lots, Debtor based his opinion on his familiarity with them and his experience selling lots at the Summit.  In his opinion the undeveloped lots are the most valuable in the project, the "prime value" lots.  They are also the largest lots.  He disagreed with LANB's appraiser's value of $410,000 per lot; he believed[14] that the undeveloped lots would bring $500,000 to $510,000 each.

Summary of Debtor's Value (using Debtor's average estimates):

| Type | Number | Value | Total |
|------|--------|-------|-------|
| Developed | 31 | $362,500 | $11,237,500 |
| Partially Developed | 18 | $345,000 | $6,210,000 |
| Undeveloped | 49 | $505,000 | <u>$24,745,000</u> |
| Total | | | <u>$42,192,500</u> |

Debtor's value seems to assume that all sales will take place at one time because it does not contain a discount for the receipt of the sales proceeds over time.  It also does not contain a projection of the time that the sales will take.  And the projection does not take into account the further costs

---

[14]He provided no explanation or justification for his belief, however.

necessary to complete the partially developed ($225,000) and undeveloped lots, or how long that process will take or what is the source of funds to do so. Debtor's value also does not take into account closing costs or commissions or taxes on commissions. Finally, if the Debtor's plan is to sell the lots over time, a discount factor would have to be applied to calculate the present value of the future sales proceeds. This was not done.

### 2. Appraiser's value.

LANB proferred Michael Dry as an expert witness on commercial real estate appraisal. He is a licensed and certified commercial real estate appraiser by the State of New Mexico. He has been an appraiser since 2004 in Santa Fe and Los Alamos, New Mexico. At the time of the hearing he had completed all courses and work experience to qualify as having the MAI designation, which he expected to receive within the month. He testified about his course work, prior experience including the appraisal of ten to fifteen subdivisions, the profession's guidelines and his familiarity with them, and his application of those guidelines to his expert report. The Court qualified him as an expert. The Court found Mr. Dry to be completely professional, extremely knowledgeable, and more than capable of explaining his reasoning as it flowed logically to his conclusions. From the testimony alone one would not have known that this was Mr. Dry's

first time testifying as an expert.[15]  His testimony and report
substantially assisted the Court in determining the value of the
property.

Mr. Dry's expert report appears at Bank exhibit 10 (Debtor
exhibit 56).  It has an effective date of February 14, 2011.  He
concluded that the highest and best use of the Summit was to sell
the developed and partially developed lots but to hold the
undeveloped lots for further development.  He believed that if
the undeveloped lots were made ready for the market at this time
they would flood the market and impact downward on the value of
both the developed and partially developed lots and increase the
time to sell those lots.  He discussed and applied the three
primary valuation methodologies: cost, sales comparison, and
income approaches.  He believed that cost was not relevant to the
Summit.  He relied primarily on the sales comparison approach in
his report.  He used the Multiple Listing Service for comparable
properties and analyzed the similarities and differences between
the comparables and the subject property.  His experience was
that 95% of sales in the area were reported on the Multiple
Listing Service, which he deemed reliable.  In addition, his
office maintains a database of other sales that have not appeared

_____

[15]Debtor's attorney (probably in jest) suggested that he was
not qualified because this was the first time he had testified as
an expert and that he had appraised "only" ten or fifteen
subdivisions.  The Court ruled that everyone starts somewhere.

-18-

on the Multiple Listing Service that were derived from other sources deemed reliable by his firm. He also had discussions with other market participants about sales expenses, overhead, carrying costs, real estate commissions and the market in general. From this information, as well as his experience, he estimated that closing costs would average 1% of gross sales price and that commissions for the sizes, values and number of lots available would be 8%. He admitted that these were "judgment calls" but after his direct and cross-examinations the Court finds that his assumptions were realistic, reasonable, and probably very accurate.

The expert report contained historical data regarding sales of comparables in this "market niche" for the years 2007 through 2010. Bank exhibit 10, p. 43. At the hearing and in Bank exhibit 11, Mr. Dry also updated the data through November, 2011. The report demonstrated that the "cumulative days on market" (i.e., this attempt at sale and previous attempts within the prior six months) went from 211 days in 2007 to 783 in 2011. Bank exhibit 11. During that same period the number of comparable lot sales fell from 132 in 2007 to 20 in 2011. Id. And, during that time the average price dropped from $301,000 to $209,400. Id. The report suggests that with the current supply of lots and the current demand there was and still is a continued downward pressure on lot prices. Mr. Dry believed that this

-19-

downward trend would continue or remain level throughout 2011 without any appreciation in the near future.[16]

In his testimony Mr. Dry explained the concept of "absorption" as being the length of time it takes to sell a group of lots, *i.e.*, the length of time it takes the market to process the supply and demand. Due to the time value of money, absorption is a critical consideration when valuing a group of properties. He noted that in the current market absorption has caused high-end lots to take considerably longer to sell and at a considerably lower price. Mr. Dry also testified that, in general, the demand in Santa Fe for high end properties is lower than previously. His report, at page 41, shows that there was currently a 4.56 year supply of lots on the Santa Fe market. Builders of "spec houses" are no longer a factor in the market; 99% of their activity has "dried up." And, investors that previously might have bought lots for investment purposes no longer do so. Mr. Dry also attempted to examine sources to predict the future of the economy. He noted that some people thought the economy would improve in 2012 but their opinion is now that it will not improve significantly until some time "farther out," even perhaps slowly through 2017.

Mr. Dry used the comparable sales approach in valuing the

---

[16] Mr. Dry's evidence was completely consistent with that of Mr. Monk.

fully developed and partially developed lots.  His initial
findings from MLS comparables were that the developed lots were
worth an average of $325,000 each and the partially developed
lots were worth an average of $345,000 each.  From this point on,
Mr. Dry's appraisal varies drastically from Debtor's estimated
values.  The report first subtracts 9% for realtor commission and
closing costs to arrive at a net average retail price of $295,750
for fully developed lots and $313,950 for the partially developed
lots.  Ex. 10, pp. 39-40.  The appraisal report then noted that
these lots were above average prices for the area, but found that
the cost was balanced by the superior views and areas.  The
report noted an oversupply of both houses for sale and lots for
sale, both of which compete with the subject lots.  See n. 2,
supra.  The report, id., p. 45, discusses the appraiser's
estimated absorption of the lots and estimates that it will take
approximately six years to sell all of them.  At this point, two
alternatives are available to complete the valuation.  The first
is to assume a bulk sale of all lots.  The second is to discount
cash flows from individual sales.

Pages 46 and 47 discuss the reasoning behind taking a
deduction for a bulk sale.  Buyers stepping into finished or
partially finished subdivisions expect price reductions when they
are buying more than one lot and/or when there is a low demand.
The report provides examples of situations where discounts of 7%

-21-

to 24% in the area, and anecdotal data from other markets showing bulk discounts of up to 50%. Mr. Dry states that "[t]he bulk sale discount rate is a direct function of the number of lots in the subdivision as well as the current economic environment and the motivation of the developer." The Summit has [31 + 18 =] 49 developed and partially developed lots and the owner is now in a Chapter 11 case. Mr. Dry believed at the time of the appraisal that 25% was appropriate considering the number of lots, the market and low demand. Mr. Dry testified that now, given further developments, his discount number would be higher. This summary table results in the appraiser's value of the developed and partially developed lots if sold in bulk:

|  | Developed | Partially | Total |
|---|---|---|---|
| Average Comparable | 325,000.00 | 345,000.00 | |
| Less 9% costs | -29,250.00 | -31,050.00 | |
| Net | 295,750.00 | 313,950.00 | |
| Less bulk discount | -73,937.50 | -78,487.50 | |
| Per lot value | 221,812.50 | 235,462.50 | |
| Number of lots | 31 | 18 | |
| Total value | 6,876,187.50 | 4,238,325.00 | 11,114,512.50 |

The report also discussed and applied a discounted cash flow ("DCF") to arrive at a value. Mr. Dry testified that using DCF is standard and, in fact, required. This method considers that the lots are sold individually during the absorption period and valued using a discounted cash flow methodology. Bank exhibit

-22-

10, p. 48. The decision to apply a 13% discount rate is explained on pages 48 and 49 and seems reasonable to the Court[17]. In addition to reducing the lot proceeds to current value, the appraiser also factored in estimated holding costs of the estimated property tax accruals on the lots and the impact of inflation. This discounted cash flow method of valuation resulted in the 31 fully developed lots having a value of $5,087,098 and the 18 partially developed lots having a value of $3,038,904. The appraiser rounded the results to:

| Type | Value |
|------|-------|
| Developed | $5,315,000.[18] |
| Partially | $3,200,000. |
| Total | $8,515,000. |

The report also indicates that $225,000 should be subtracted from the partially developed lots, because that is the amount it will cost to complete them.

For the undeveloped lots, Mr. Dry used a sales comparison approach. Bank exhibit 10, p. 58. Going back several years, he found only eight closed comparable sales of undeveloped lots.

_____

[17]A higher discount rate reduces the present value of future cash flows. E.g., In re SW Boston Hotel, 449 B.R. at 164 ("If he had used a 20% discount rate, the value of the Condominiums would have been $86,600,000; if he had used a 22% discount rate, the value of the Condominiums would have been $84,100,000.")

[18]The number in the report is actually $6,000,000. But, that number was based on 35 developed lots when in reality there are 31. This number is 31/35*6,000,000.

-23-

For each sale, he compared the price paid to the estimated retail values of the lots, to determine the ratio of the price to final value. The ratios ranged from 25% to 53%. He then factored in whether before the transaction a plat had been approved or a master plan had been approved. He also put more weight on the more recent sales. In his judgment, he concluded that 35% was an appropriate ratio to apply to the Summit undeveloped lots.

The undeveloped lot average size will be 52,014 square feet. The average developed lot contains 30,205 square feet. The report compares the size of the average developed lot with the average undeveloped lot (the undeveloped lot is 21,809 square feet larger). The value of the average fully developed lot previously was compared to the value of the average partially developed lot to show that each additional square foot would be worth about $4.00. Therefore, the report calculated that the average value for a 52,014 square foot undeveloped lot, if it were developed, would be $412,236. The Court finds this to be a reasonable conclusion. The report rounded the lot value to $410,000. Applying the 35% discount to the value of 49 undeveloped lots each valued at $410,000 resulted in a total value of $7,031,500, rounded to $7,000,000.

In the reconciliation section the report states that between the two methods to calculate the value of the fully developed lots and the partially developed lots, that it was most

-24-

appropriate to give most emphasis to the DCF method. The Court agrees. The theory of the bulk discount would be for another developer to buy the remaining lots, finish the development and sell the lots. The DCF method, on the other hand, attempts to predict, as closely as possible, the actual return that will be obtained from selling the lots over the absorption period (which is what Debtor seeks to do), considering holding costs and inflation. In this case, the DCF approach yielded a smaller value for the lots. If this were true, no reasonable purchaser would buy the lots for the higher bulk discount value if they would then end up with less by holding and selling the lots. Therefore, the Court agrees that the DCF method should have greater emphasis.

The report concludes at p. 59 that the values of the lots as of February 14, 2011 are as follows:

| Type | Value |
|------|-------|
| Developed | $5,315,000.[19] |
| Partially | $3,000,000. |
| Undeveloped | $7,000,000. |
| Total | $15,315,000. |

Mr. Dry's expert report had an effective date of February 2011. At trial he testified that property values had declined linearly from that time to the date of the hearing.

---

[19]See n. 18, supra.

-25-

### 3.    Court's value.

Based on the foregoing, the Court finds that the value of the lots in Summit was 99% of the appraiser's value as of the petition date, i.e., $15,161,850.  The Court finds that Debtor's opinion of value is not entitled to any weight because it is not based on any real world evidence.  It is all based on historical facts that in the current market are simply not relevant as a result of the drastic market declines that have occurred since 2009.  The Court finds that Mr. Dry's opinions are based on real world facts, analyzed reasonably and in accordance with valuation principles accepted in the industry.  The Court took a 1% reduction to recognize the testimony that property values had, in fact, continued to decline in 2011.  The Court did not reduce the value for any post-petition decline.  LANB attempted to introduce, over Debtor's objection, Exhibit 47, which was an update of the February, 2011 appraisal through an effective date of January 9, 2012.  The Court refused admission because it had not been produced by the deadline set in the scheduling order nor provided to Debtor until the day before the hearing.  The Court therefore has not considered the content of Bank exhibit 47.

### C.    Equity.

As of January 19, 2012 the equity was:

| Lot value | $15,161,850 |
| Escrowed proceeds | $395,336 |

-26-

| Total collateral | $15,557,186 |
|---|---|
| Total liens and taxes | $-16,214,423.85 |
| Equity | $-657,237.85 |

From January 19, 2012, to February 16, 2012, the date of entry of this Memorandum Opinion another 28 days of accruals at $5,339.411671 per day represents another $149,503.53 of interest and taxes, so as of the release of this opinion, LANB has become undersecured in the amount of $806,741.38.

**REORGANIZATION PROSPECTS**

The Court finds that there is no reasonable chance of a reorganization in sight. This finding is based on various factors:

1. Monthly Operating Reports

The most recent monthly operating report ("MOR") filed is for the period ending December 31, 2011. Doc 169; see also the MORs for July, August, September and October 2011 (Bank exhibits 31-34) and for November 2011 (doc 143). The petition was filed on July 22, 2011. The report covers slightly over five months in the Chapter 11. Business revenues for the entire period are $-0-. Business expenses for the entire period are $-0-. There are no employees[20]. A review of the docket shows that there are no pending sales, so there are no expectations of business revenue

---

[20]In contrast, there is a household employee for which it appears no taxes are paid.

-27-

for the foreseeable future.  There does not seem to be a business left to reorganize.

The only regular income of the debtor is social security in the amount of $1,749.40 per month ($8,747.00 total during the case).  Other cash has come from: 1) distributions from Summit Properties, Inc. of $91,603.92, 2) a $30,000 retainer paid by Debtor to his bankruptcy attorneys before the bankruptcy[21], 3) cash from surrender of Debtor's wife's insurance, $16,119.51, 4) a federal tax refund of $2,383.65, 5) an insurance refund of $1,036.70, 6) some small miscellaneous items totaling $123.10, and 7) substantial cash transfers from Janice Brutsche, the non-filing spouse.  There was also a post-petition loan from Wells Fargo of $11,704.46.  The Court assumes that the "other cash" receipts were one time events and not likely to recur, with the possible exception of additional borrowing from Janice Brutsche.

Cash disbursements during the Chapter 11 total $154,901.14[22] which is 17.70 times the amount of regular income.  The ending bank balance on December 31, 2011 was $13,300.32, which leads the Court to believe that the cash disbursements of the Debtor are

---

[21]The Court does not understand why this is treated as a cash receipt by the debtor-in-possession.  It is an asset (that is now used up).

[22]After deducting $83,275.00 in "bank transfers" from both cash receipts and disbursements.

-28-

being funded by depletion of estate assets[23] and borrowing from Janice Brutsche.[24] Amongst the notable cash disbursements are payment of Debtor's home mortgage of $43,749.72[25], payment of real estate taxes of $9,094.84, payment of professional fees of $64,202.81, insurance of $13,177.44 and $16,318 for food, household expenses, household repairs and utilities. Social security cannot fund this estate and post-petition borrowing should not.

Attachment 5 to the December MOR is the post-petition accounts payable listing. Debtor has incurred $215,365.86 in unpaid post-petition payables. Theoretically these are entitled to administrative expense priority.

2. <u>A Plan</u>

Debtor has not filed a plan or disclosure statement. Debtor exhibit 67 was included in the exhibit book at the hearing, but

---

[23]<u>E.g.</u>, the $91,603.92 from Summit Properties is obviously income from an estate asset and would be estate property. It is gone.

[24] The Court does not consider in this opinion whether any assets held in the name of Janice Brutsche should be considered property of the estate pursuant to §541(a)(2) (community property). Ms. Brutsche testified that she and Mr. Brutsche had entered into a prenuptial agreement before they wed, but that agreement is not in evidence. And in any event, to be clear, there is nothing inherently wrong in a debtor in possession using unencumbered estate assets for living expenses.

[25]Consisting of semi-weekly payments to Wells Fargo of $5,852.23 (an amount equal to 3.3 times Debtor's monthly social security).

-29-

not moved into evidence.  Debtor exhibit 67 is "Debtor's Chapter 11 Plan of Reorganization, dated November ___, 2011".  Therefore, there are no plan or disclosure statement before the Court.[26] Debtor filed this case on July 22, 2011 and the exclusivity period ran on November 21, 2011.

At the hearing Debtor was asked if he had a plan.  He responded that first, he would implement an aggressive marketing plan[27] and second, he would build a model home[28] and staff it full time seven days a week to show passers-by the development.  He proposed that as lots sold he would retain 6% for his operations and a reserve for development work, and the rest would be divided

---

[26] Even if Debtor exhibit 67 had been admitted into evidence, it contains no concrete provisions to show how Debtor can reorganize.

[27]LANB's evidence shows that Debtor's intent to start marketing aggressively began being promised in 2009.  It has not yet started, or if it has, it has not been successful.

[28]He has no funds to build this house.  Therefore, he filed the Motion to Use Cash Collateral, in which he is proposing to use some $300,000 in escrow at LANB from proceeds from sales of two lots on which LANB had a mortgage.  His wife also testified that she might consider loaning $200,000 to the Debtor at 9% or so (an interest rate which the Court takes as a reflection of her assessment that this would be a risky investment), if she were given a mortgage on the house.  When cross-examined she admitted she was not aware there would be one or two mortgages ahead of hers, and she stated that she would need to reconsider the offer after speaking to her attorney.  The Court does not consider this to be a firm commitment.  Furthermore, the Court is not convinced by the Debtor's testimony on direct and cross that having a model home would be of any benefit.  See also Deposition of Dermot Monks, December 13, 2011, at p. 17, l. 24 to p. 18, l. 4 (Model home makes no difference) and p. 24 ll. 14-18 (Model home has no significant impact).

-30-

as the Court determined.  But, he added, he had "substantial other assets" that he could apply to the plan[29].  The first example was "sales of houses" that he would, in the future, build on the lots being sold.  He thought that he would be hired two to three times a year to build houses on lots being purchased[30].  He also proposed using other assets such as land zoned for community use[31], and 340 acres designed for "donative" land, _i.e._, open space[32].  He also claimed he would be able to contribute the value

---

[29]At various times during the hearing the Debtor referred to other resources that could be used as adequate protection, or to turn into cash for operations, etc.  However, Debtor presented no concrete evidence of the real value of any of these assets.  And, after cross-examination of the Debtor the Court has great doubts that the assets are worth anything close to Debtor's beliefs and has doubts about their true availability.

[30]The Court notes that in 2011 two lots sold, in 2010 one lot sold, and in 2009 two lots sold.  The Court finds this testimony purely speculative.  It is also so widely variant from historical numbers that the Court can only conclude that this is completely unrealistic.

[31]There was no explanation of who would buy such land, why, or at what price.

[32]Similarly, there was no explanation of who would buy such land, why, or at what price.  Debtor had already gifted five tracts of land to the Nature Conservancy pre-bankruptcy.  He has filed an adversary proceeding to recover four of those tracts.  Debtor also testified on cross-examination that he may have a duty to transfer the open space to the Homeowners Association upon completion of the infrastructure.  The Homeowners Association agrees that the common area lots need to be transferred to the Association.  Santa Fe Summit Homeowners Association's Joinder in Grevey-Liberman's Motion to Convert or Dismiss.  Doc 179.

-31-

of a sound stage in Albuquerque[33] and his house, which is currently listed and on the market for $2.395 million[34] (and has a mortgage of approximately $1.7 million).

When asked the time frame for performing the plan, he believed he could liquidate some assets in three to four years, and including lot sales could pay creditors in four and one-half to seven years. When asked if he would take any money for himself from sales, he responded that he would take money only for the business to continue marketing and to pay his basic living expenses. He would not take profits.[35] There was no testimony solicited or given about the possible tax effects on Debtor if he were to sell millions of dollars of real estate.

---

[33]He was referring to property owned by an affiliate, Amusing Investments, which has other members. It was not clear to the Court if Debtor alone could use that entity's assets as he pleased. But see Operating Agreement of Amusing Investments, LLC (Bank exhibit 45, exhibit 378), at §VI(E)(2)(Conflict of Interest provisions). The Court also notes that the property is in foreclosure by LANB, and there was no evidence of value except Debtor's own opinion of $2.0 million and a guess by a LANB bank officer that it was somewhere upwards of 1.5 million. There was no evidence of whether Amusing Investments had creditors or was even solvent. LANB exhibit 35 is a financial statement of Amusing that showed no retained earnings, but an accumulated deficit of $40,000 as of October 2011. For that reporting period its income was less than the interest accrual on the LANB mortgage.

[34]With no offers. Also, given the cash shortages in the DIP account, it is not clear to the Court that the home mortgage might not go into default and foreclosure and Debtor could conceivably realize no equity in it.

[35]Taking "living expenses" is profit.

-32-

The Court finds that Debtor's testimony about a plan is thoroughly speculative, unresearched, and unreasonable. There really is no plan before the Court.

3.  <u>Totally unfeasible</u>.

GL's attorney constructed a picture of future cash flows that would result from Debtor's incipient plan.[36] Using various exhibits and pointing out Debtor's previous testimony, the annual income and expenses and costs would resemble the following table, assuming that Debtor would be lucky enough and the economy would recover enough to allow 6.28 sales per year:

| Revenues | Annual revenues |
|---|---|
| Lot sale | $325,000 |
| Less: closing costs at 7% | ($22,750) |
| Estimated release price | ($171,000) |
| Net revenue per lot | <u>$131,250</u> |
| 6.28 sales per year; annual | <u>$824,250</u> |
|  |  |
| Expenses | Annual expenses |
| Staffing model home | $35,000 |
| Advertising | $62,000 |
| Accounting | $12,000 |
| Insurance (business) | $4,000 |
| Living Expenses (from Schedule J) | $175,000 |

---

[36] The dueling accountings were presented on flip charts and admitted into evidence. The Court has summarized them in the exhibit attached to this memorandum opinion.

-33-

| Revenues | Annual revenues |
|---|---|
| Property taxes (deemed low) | $65,000 |
| Interest to GL | $143,500 |
| Interest to LANB | $565,000 |
| Total annual expenses | $1,061,500 |
| Net loss first year | ($237,250) |

The plan is not feasible even if Debtor were to sell 6.28 lots per year, which the Court itself finds not reasonable.

On redirect, Debtor's counsel attempted to deflect the dismal projection for the first year of operation. His opening premise, however, was that the net revenue per lot would be $300,000 for each of the 6.28 lot sales, which would generate $1,884,000 of revenue. If this were true, it would certainly more than pay the expected $1,061,500 expenses. However, the $300,000 is impossible because it allows only $25,000 to cover closing costs, commissions and LANB's release prices. This is not reasonable. If a release price is not paid, the lot simply cannot sell.

4.    Single asset real estate.

The parties did not address whether this Chapter 11 case is a single asset real estate case. The bankruptcy code defines that term as follows:

> The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on

-34-

which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51B).

The significance of the designation is that if a debtor's property is found to fall within the definition, 11 U.S.C. § 362(d)(3) imposes an additional basis for relief from the automatic stay. That section provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
...
(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—
    (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
    (B) the debtor has commenced monthly payments that—
        (I) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
        (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate....

-35-

11 U.S.C. § 362(d)(3).  The single asset real estate provisions
were designed to impact real estate entities attempting to cling
to ownership of real property in a depressed market, as opposed
to businesses involving manufacturing, sales or services.  In re
Philmont Dev. Co., 181 B.R. 220, 223 (Bankr. E.D. Pa. 1995).  The
drafters were implementing a mechanism by which a single species
of chapter 11 cases would be forced to proceed on an expedited
track or face loss of the protections of the automatic stay.  Id.

     In In re Pioneer Austin East Development I, Ltd., 2010 WL
2671732 (Bankr. N.D. Tex. 2010), the court concisely described
the criteria to use in determining whether a debtor falls within
the scope of section 101(51B):

> First, the real property must constitute a single
> property or project.  This definition of real property
> recognizes that real estate development can be
> completed in separate projects, comprised of several
> tracts or parcels of land, and still constitute a
> single property for the purpose of single asset real
> estate cases.  See In re Club Golf Partners, 2007 WL
> 1176010, *5 (E.D. Tex. 2007) (finding that several
> separate tracts of land collectively operated as a golf
> club are a single property under the definition of
> single asset real estate).  Second, the real property
> must generate substantially all of the debtor's income.
> The focus is on the revenues received from the property
> itself, rather than the fruit of worker's labor and
> management services.  See id.  Third, the debtor must
> not be involved in any substantial business other than
> the operation of its real property and the activities
> incidental thereto.  An absence of active business
> operations with only passive and truly incidental
> activities such as the mere receipt of rent will render
> the property single asset real estate.  See In re Kara
> Homes, Inc., 363 B.R. 399, 406 (Bankr. D. N.J. 2007).
> In contrast, varied business activities will render a
> debtor outside the scope of § 101(51 B).  See Club Golf

-36-

Partners, 2007 WL 1176010 at *6.  The inquiry distinguishes between entrepreneurial, active labor and efforts versus merely passive investment income.

Id. at *2.  The Court finds that Debtor's case is a single asset real estate case.

First, the Summit is a single project.  It may have been acquired in stages from different sources, but the history of its development shows one cohesive up-scale housing development.  See Id. ("Although the debtor's housing development is comprised of several tracts of land, purchased separately, financed differently, and described by separate metes and bounds, the debtor built cohesive and interdependent subdivisions on the property, indicating a unitary purpose.")(Court found a single project.)(Citation and internal punctuation omitted.)  Indeed, the testimony of both Janice Brutsche and Dan Castille directly state that they believed this was a single project.

Second, the Summit generates substantially all of the Debtor's income.  During the chapter 11 the largest source of income was the distribution from Summit Properties, Inc., which is one of Debtor's entities[37] through which he sells lots.  Debtor

---

[37]During the hearing Debtor testified that for accounting purposes, all costs and capitalizations for the lots were kept track of in different entities.  When, before a sale he would deed the lot to that corporation which would, in turn, deliver the deed to the seller.  This method was adopted for accounting purposes.  Debtor's CPA verified this testimony.  LANB argued that the proceeds of the sales were then therefore the entity's and not estate property for cash collateral purposes.  The Court
(continued...)

-37-

receives social security, but that is not the historical or projected "substantial" source of income. Both the loan documents and testimony of Elizabeth Cavasos demonstrate that LANB was looking to the sales proceeds of lots to repay the millions of dollars of loans.

Third, Debtor is not involved in any substantial business other than the operation of its real property and the activities incidental thereto. In prior bankruptcy cases many developers have argued that development is a substantial business other than the operation of the real property. Courts disagree. <u>See</u> <u>id.</u> (Designing and redesigning subdivisions and making improvements to unimproved land for the purpose of selling residential lots does not constitute substantial business "other than the operation of the real property and activities incidental thereto.") <u>See also</u> <u>Kara Homes, Inc. v. National City Bank (In re Kara Homes, Inc.)</u>, 363 B.R. 399, 406 (Bankr. D. N.J. 2007):

> The Affiliated Debtors are in the business of constructing and selling single family homes on the parcels of real estate owned by the Affiliated Debtors. In order to build and sell homes, it is often necessary to acquire the land on which to build the homes, and plan the community in which they lie; likewise, it is necessary to market those homes for sale and maintain the properties. All of the activities identified by the Debtors as reflective of "business operations" are merely incidental to the Affiliated Debtors efforts to sell the these homes or condominium units and do not constitute substantial business.... Thus, the Court

---

[37](...continued)
disagreed.

-38-

finds that the Affiliated Debtors fall within the
definition of "single asset real estate" debtors and,
as such, 11 USC § 362(d)(3) applies.

Because Debtor's case is a single asset real estate, he must
comply with section 362(d)(3) or face stay relief.  In other
words, because the Court has determined above that Debtor has not
filed a plan that has a reasonable possibility of being confirmed
within a reasonable time, Debtor will have to commence making
monthly non-default rate interest payments to GL and LANB.  GL's
daily accrual is $741.949201.  LANB's daily accrual is
$1,355.742787[38].  The combined daily interest accrual is $2,097.60
or about $62,931 a month.  The MORs do not demonstrate anywhere
near this cash flow to meet this obligation.  There was no
testimony at the hearing that this cash could be available.
Therefore, the Court finds that there is no reasonable
reorganization in prospect as to this property because Debtor
cannot meet the requirements of § 362(d)(3).  The stay must be
modified.

### SUMMARY SECTION 362(d)(2)

For the reasons stated, the Court concludes that there is no
equity in the Summit and that there is no reasonable prospect of
a reorganization in sight.  Therefore, the automatic stay should

---

[38]LANB's claim A is secured by the Summit.  It has a
principal balance of $8,997,202.13 and a non-default contract
rate (required by §362(d)(3)(B)(ii)) of 5.5%.  The daily accrual
is $1,355.742787.

-39-

be terminated under section 362(d)(2).

**ADEQUATE PROTECTION**

LANB is undersecured. Its position is eroded daily by accrual of GL interest and property taxes. The evidence does not demonstrate that Debtor has the capacity to pay those items on an ongoing basis. LANB is therefore not adequately protected and the automatic stay should be lifted under section 362(d)(1) as well.

**CONCLUSION**

It is with some reluctance that the Court concludes the stay must be modified. Mr. Brutsche was a substantial cause of the wave of high-end development that caused Santa Fe to become a world-class destination residential location. Unfortunately the global wealth structure that supported the sales and development of Summit and similar properties has been washed away by the tsunami of the economic crash of the last three years, and so there is no longer support for the level of sales that historically took place. Those seismic economic events have completely changed the high-end residential real estate market in Santa Fe and left Mr. Brutsche bereft of what he needs to continue what up to now was a very successful development career.

The Court will enter separate orders 1) granting LANB's Motion for Relief from Automatic Stay, 2) granting GL's Motion for Relief from Automatic Stay, and 3) denying Debtor's Motion to

-40-

Use Cash Collateral without prejudice.

_(signature)_

Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  February 16, 2012

Copies to:

Edward A. Mazel
Arland & Associates, LLC
201 3rd ST NW, STE 505
Albuquerque, NM 87102-3331

James A. Askew
201 Third Street, NW, Suite 505
Albuquerque, NM 87102

Leonard K Martinez-Metzgar
PO Box 608
Albuquerque, NM 87103-0608

Paul M. Fish
PO Box 2168
Albuquerque, NM 87103-2168

Thomas D Walker
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

Clifford C Gramer, Jr
3733 Eubank Blvd NE
Albuquerque, NM 87111-3536

Chris W Pierce
Hunt & Davis, P.C.
2632 Mesilla St. NE
Albuquerque, NM 87110

-41-

**PMF EXPENSES (GL23):**

| | |
|---|---:|
| Model | 35,000 |
| Advertising | 62,000 |
| Accounting | 12,000 |
| Insurance | 4,000 |
| Living expenses | 175,000 |
| Property taxes | 65,000 |
| G-L Interest | 143,500 |
| LANB interest | 565,000 |
| | |
| TOTAL | 1,061,500 |

**PMF REVENUE (GL24):**

Per lot revenue          325,000
    less 7%        (closing costs)
                            302,250

    less "appr value" (release)    <171,000>

NET ("subtraction result")        131,250

    times 6.28 lots sold

TOTAL NET REVENUE                824,250

**JA CALCULATIONS (D93)** (modified to include only essential data):

Net per lot revenue                      300,000

    times 6.28 lots sold

ANNUAL NET REVENUE                    1,884,000

65% paid to LANB        1,224,600
    LANB interest        <449,860>
    LANB principal pmt      774,740

Available to DIP                          659,400

    Less expenses                    [<353,000>]

NET AVAILABLE TO ESTATE              306,400