UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:  RALPH LEO BRUTSCHE,                                    Case No. 11-13326

  Debtor.

---

MEMORANDUM OPINION

THIS MATTER came before the Court on the Trustee's Motion to Approve Compromise of Controversy under Bankruptcy Rule 9019 ("Motion to Approve Settlement").  *See* Docket No. 393.  The Court held a final evidentiary hearing on the Motion to Approve Settlement on July 11, 12, and 30, 2013 and took the matter under advisement.  For the reasons described below, the Court finds that the Trustee's Motion is well taken and should be granted.  This Memorandum Opinion constitutes findings of fact and conclusions of law as may be required by Fed.R.Bankr.P. 7052 and 9014(c).

PROCEDURAL HISTORY

The Debtor filed a voluntary petition under Chapter 11 on July 22, 2011 (the "Petition Date").  On or about December 22, 2010, creditor GL[1] filed a foreclosure action in the First Judicial District Court, Santa Fe County, New Mexico, styled *Liberman, et al. v. Brustche et al.*, Cause No. D 101 CV 201004408 ("Foreclosure Action").  In the Foreclosure Action, GL and Los Alamos National Bank ("LANB") sought to foreclose their respective mortgages against certain lots owned by the Debtor, and the Debtor filed a lender liability crossclaim against LANB.

On October 17, 2011 and October 20, 2011, LANB and GL, respectively, filed motions

---

[1] "GL" refers to Grevey-Liberman, an investment group that includes the following individuals, among others: Marc Lois Liberman; Bank of America, N.A. as Trustee of the Marc Louis Liberman Trust established under the Marguerite Liberman Revocable Trust; Bank of America, N.A. as Trustee of the Michele Louis Liberman Revocable Trust; and Helen A. Grevey.

for relief from the automatic stay to permit them to continue to prosecute the Foreclosure Action (together, the "Stay Relief Motions"). On October 26, 2011, the Debtor filed an adversary proceeding (Adv. No. 11-1187) against LANB to avoid certain payments the Debtor made to LANB as fraudulent transfers ("Fraudulent Transfer Action"). The Debtor also filed an adversary proceeding against the Nature Conservancy on December 15, 2011 ("Nature Conservancy Action"), claiming breach of a donation agreement under which the Debtor was to receive marketable tax credits.

In December 2011, the Honorable James S. Starzynski , who was then presiding, conducted a 5-day evidentiary hearing on the Stay Relief Motions. On February 16, 2012, Judge Starzynski granted relief from the stay to permit both GL and LANB to prosecute the Foreclosure Action and to sell the mortgaged property if permitted by the state court. Several months later, the bankruptcy case was converted from Chapter 11 to Chapter 7. Yvette Gonzales was appointed as the Chapter 7 trustee ("Trustee"). Ms. Gonzales was substituted for the Debtor in the Fraudulent Transfer Action, the Nature Conservancy Action, and the Foreclosure Action. Thereafter, GL foreclosed its mortgage on the Debtor's partially developed and undeveloped lots.

The Trustee filed her Motion to Approve Settlement on March 7, 2013. The only party who objected was the Debtor's wife, Janice Brutsche.

## FINDINGS OF FACT

The Debtor is an experienced residential subdivision developer who has worked in the real estate business for over fifty years. During his career, the Debtor has developed more than 1300 lots. When he commenced his Chapter 11 case, the Debtor was developing, in phases, a high end subdivision in a mountainous area northeast of Santa Fe, New Mexico known as Santa

Fe Summit. Individual lots are large, secluded, and cost from $300,000 to over $1,500,000.

On the Petition Date, the Debtor owned thirty-one "fully developed" lots, meaning all plats had been approved and filed, all infrastructure had been installed, and utilities were available. He owned eighteen "partially developed" lots for which plats had been approved and filed but the infrastructure work had not been completed. He also owned forty-nine "undeveloped" lots which were not platted and for which no infrastructure had been installed. GL held a first mortgage on the partially developed and the undeveloped lots. LANB held a second mortgage behind GL on the partially developed lots and a first mortgage on the fully developed lots. The Debtor or his non-filing spouse own several other lots free and clear of liens. The development also contains a number of lots which were sold to third parties over the past twenty years; some have houses, others do not.

The Debtor had a longstanding banking relationship with LANB, which financed his development of residential subdivisions. For many years, LANB provided the Debtor a revolving line of credit with a maturity date of one year after execution of a note, and renewal of the note each year when it matured. The loans helped the Debtor complete infrastructure and fund operations. As the Debtor completed infrastructure, the value of the collateral was expected to increase.

On August 15, 2006, LANB renewed a revolving line of credit ("RLOC") and increased the Debtor's credit line from $6.5 million to $10 million. A note evidencing the debt - which matured on August 15, 2007 - was secured by a Line of Credit Mortgage encumbering the fully and partially developed lots in the Santa Fe Summit.

A Construction Loan Agreement associated with the note and mortgage provides for partial releases of lots from the mortgage lien to facilitate the sale of lots and payments on the

RLOC.  LANB honored lot release requests upon payment of the applicable lot release price until it declared a default and accelerated the then outstanding renewal note.  The Construction Loan Agreement states: "[t]his Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing and executed by you and me."

LANB extended and renewed the RLOC note on August 15, 2007 for one year.  Around that time, a deep recession began in the United States.  The recession negatively affected residential construction, including the Debtor's development of Santa Fe Summit.  Lot sales slowed, and the Debtor began experiencing cash flow problems.

In early 2008, the Debtor entered into a purchase agreement with Donald L. Bud Hudgins, Jr. whereby Hudgins agreed to acquire the unsold portions of Santa Fe Summit.  Mr. Hudgins needed financing from LANB to complete the purchase.  On or about June 26, 2008, LANB executed a loan commitment to Mr. Hudgins for the intended purchase of the Santa Fe Summit properties for $15 million.  The commitment specified that the funds would be used to purchase 53 developed and partially developed lots in Santa Fe Summit.  It also provided that LANB would fund the lower of the appraised value or 75% of the purchase price.  Loan closing was contingent upon an appraisal acceptable to LANB.  LANB ordered an appraisal.  The appraiser valued the Santa Fe Summit property as of November 12, 2008.

As a condition to providing financing to Mr. Hudgins, LANB required the Debtor to curtail sales of Santa Fe Summit lots to preserve its collateral position for the new loan.  The Debtor chose to discontinue marketing and sale efforts so that Mr. Hudgins could obtain the necessary financing from LANB.  However, he continued constructing infrastructure on the properties to satisfy closing condition.  For reasons unknown to the Court, the sale to Mr.

Hudgins did not close. There is no evidence that the sale fell through as a result any wrongdoing on the part of LANB.

On July 15, 2008 - prior to the maturity of the 2007 RLOC Note - LANB modified and renewed the Debtor's RLOC note. The modified note reduced the credit limit to approximately $9.6 million. The stated maturity date of this note was August 15, 2009. On August 15, 2008, Debtor executed another renewal RLOC note on the same terms. It is unclear why the second note was executed a month later.

On January 30, 2009, the Debtor met with LANB's president, William Enloe, to discuss financing options that would enable him to reinstate a marketing program and regain sales momentum. The Debtor testified that LANB informed him that in June, 2008 the FDIC had instructed LANB to terminate his revolving line of credit. The Debtor testified that if LANB had informed him back in June, 2008 that it would be terminating his line of credit, he could have salvaged his development project. He testified that he then had the money to pay off GL and prevent foreclosure, and that he could have either forced Mr. Hudgins to close or resumed an aggressive marketing strategy to sell the property to someone else.

On February 5, 2009, the Debtor wrote to Mr. Enloe to "memorialize" what he asserts were Mr. Enloe's representations to him at the January 30, 2009 meeting concerning LANB's willingness to furnish additional financing. The letter states that LANB expressed the willingness to: (1) convert an outstanding $9.6 million RLOC note to an interest-only term loan of three to five years with reductions in principal coming from lot sales; (2) make an additional $4.2 million term loan to allow the Debtor to pay off the GL first mortgage on certain properties also pledged to LANB; and (3) establish a new $1.5 million RLOC to cover operating expenses and marketing costs (the "New Loan Package" or the "New Loans").

On or about March 24, 2009, the Debtor and his attorney met with LANB representatives. The Debtor testified that Mr. Enloe again assured him that a renewal of his existing loan would not be a problem and confirmed that the New Loan Package would consist of the three components outlined above. The Debtor testified that Mr. Enloe told him that LANB would need a new appraisal of the properties to support the New Loans. LANB never signed any writing stating that it would make any of the New Loans. LANB never prepared any documents for the New Loan Package. LANB and the Debtor never agreed to certain material terms of any New Loans, including the maturity date or interest rate for any of the loans or release prices. The Debtor testified that at a later meeting, Mr. Enloe suggested it would be more likely that LANB would make the New Loans if the Debtor could provide additional capital and suggested that he seek an equity partner. The Debtor testified that LANB represented that it had persons who might be interested in investing with the Debtor.

The Debtor also testified that LANB represented it would make a loan to him in an amount of 75% of the appraised value of a sound studio in Albuquerque, New Mexico. The property was owned by Amusing Investments, LLC, an entity the Debtor and several of his family members owned. Because LANB had suggested additional collateral, the Debtor borrowed approximately $420,000 from another bank, using his personal residence as collateral, and paid off a mortgage on the sound studio. He did this so he could give LANB a first mortgage on that property which had a value, in his opinion, of $1.8 million. The Debtor testified that LANB promised to lend him $1.35 million, secured by the sound studio. Approximately two days before closing, LANB informed the Debtor that it would only loan him $700,000. The Debtor testified that LANB then delayed obtaining an appraisal on the sound stage for seven months, which left him without any money to pay for marketing of his lots. He

testified that he nevertheless went forward with the loan because he was under extreme duress to raise funds to market the lots.

Each time LANB made a loan to the Debtor, it was required to obtain approval from LANB's loan committee. Debtor was aware of this requirement. He referred to the approval process in two letters he sent to LANB, and his attorney acknowledged the process. Although the Debtor testified he did not believe loan committee approval was required for the New Loan Package because he as dealing directly with LANB's president, the Court does not find that testimony credible. The New Loan Package was never submitted to or approved by LANB's loan committee.

LANB ordered another appraisal of the Santa Fe Summit properties. The appraisal was not completed by the time the then-existing RLOC loan matured on August 14, 2009. The Debtor testified that LANB informed him that LANB would enter into a temporary provisional loan arrangement until the appraisal was completed. The Debtor testified that Mr. Enloe again restated LANB's willingness to grant the New Loan Package if the new appraisal supported LANB's loan-to-value requirements. The Debtor then executed a new promissory note dated July 17, 2009. The note was a non-revolving credit line with a maturity date of July 17, 2010.

Each of the notes the Debtor executed contained the following statement above the Debtor's signature:

> UNDER NEW MEXICO LAW, ANY CONTRACT, PROMISE OR COMMITMENT TO LOAN MONEY OR TO GRANT, EXTEND OR RENEW CREDIT, OR ANY MODIFICATION THEREOF, IN AN AMOUNT GREATER THAN $25,000, THAT IS NOT PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES, MUST BE IN WRITING AND SIGNED BY THE PARTY TO BE CHARGED TO BE ENFORCEABLE. BORROWER HEREBY ACKNOWLEDGES RECEIPT OF THIS NOTICE ON TODAY'S DATE.

Each note also states: "[t]his Note may not be amended or modified by oral agreement. No amendment or modification is effective unless made in writing and executed by you and me.

This Note and the other Loan Documents are the complete and final expression of the agreement."

The appraisal was completed in September 2009. The aggregate gross retail value for 38 fully and partially developed lots was listed as $16.72 million, and the value of 49 undeveloped lots was listed as $24.5 million. The appraisal omitted another 18 lots which the Debtor believed to be worth $7.2 million. Even without these 18 lots, however, Debtor claims the aggregate loan-to-value ratio was 23.28%.

The Debtor testified that after Mr. Enloe advised him that the FDIC told LANB that the Debtor's loans were to be "classified," Mr. Enloe allegedly suggested that he attempt to find an investor to alleviate his cash flow problems and told him that additional collateral was necessary for LANB to make the New Loans. The Debtor testified that Mr. Enloe also advised him that LANB would consider loaning money to a qualified investor to facilitate infusion of additional capital into the project.

The Debtor engaged a private investment banking company, Hyde Park Group, LLC ("Hyde"), to find an equity investor. Hyde was managed by John D. Emery ("Mr. Emery"). A potential investor became interested. In early 2010, the Debtor asked Mr. Enloe to meet with Mr. Emery to discuss the terms of a loan to the potential investor who was conducting due diligence. Mr. Enloe met with Mr. Emery on or about February 16, 2010. The Debtor testified that Mr. Enloe informed Mr. Emery that the Santa Fe Summit loan had been "classified" by the FDIC. The prospective investor did not invest in the project.

On July 17, 2010, LANB renewed the note that matured on that date in the reduced amount of $8,921,500. The renewal note was not a revolving line of credit. It required installment payments of interest beginning on October 17, 2010 and each third month thereafter.

The maturity date for the note was July 17, 2011, at which time all principal and accrued interest would be due.

The Debtor defaulted on his obligations to GL on or about June 24, 2010. In or about November, 2011, the Debtor failed to make a required payment to LANB, and LANB declared a default under and accelerated the Debtor's loan. Before the Debtor defaulted on the loan, LANB released the lien of its mortgage against each lot the Debtor sold in exchange for payment to LANB of 75% of the sale price. In December, 2010, the Debtor entered into purchase agreements to sell lots 15 and 25 in Santa Fe Summit. Because the Debtor was already in default, LANB refused to release its lien against the lots in exchange for payment of the lot release prices. So the sales could close, LANB and the Debtor agreed to deposit $395,119.68 of the sale proceeds into an escrow account until a court determined entitlement to the funds.

GL filed the Foreclosure Action on or about December 22, 2010. The Debtor commenced his Chapter 11 case on July 22, 2011. GL obtained relief from the automatic stay to pursue the Foreclosure Action on June 8, 2012. Discovery was about close on July 12, 2012 in the Foreclosure Action, a trial was set for December 12, 2012, and LANB had filed a motion for summary judgment. The Debtor owed the Bank upwards of $10 million meaning that the Trustee needed to recover more than that amount, plus her litigation costs, to net any recovery for the estate. The Trustee testified that after conducting an investigation, she concluded that the Debtor had not conducted adequate discovery to prepare the case for trial, and that she had inadequate information to respond to LANB's motion for summary judgment. She testified that the Debtor had not designated any experts in the Foreclosure Action to testify about damages, banking law, lender liability or for any other purpose. She testified further that the Debtor had not supplied any damages calculations in discovery. She also testified that she could not find

anyone willing to represent her in the Foreclosure Action on a contingency fee basis. The Trustee estimated that she would incur legal fees ranging between $250,000 to $750,000 to prosecute the Debtor's lender liability claims, depending on whether the state court reopened discovery and permitted the Trustee to call expert witnesses.

Further, in consultation with her counsel and after conferring with the Debtor's and LANB's counsel, the Trustee concluded that except for the claim relating to the loan secured by the sound stage property, her prospects of success on the counterclaim were not good. Within several weeks after the Trustee was appointed, she filed motions in the Foreclosure Action to reopen discovery and vacate the trial setting. The Trustee reached a settlement with LANB before the motions were heard.

Dan Castille, LANB's senior in-house bank counsel, testified that as of July 10, 2013, the Debtor owed LANB $13,310,736.81, plus fees, interest, and taxes. Michael Dry, a commercial real estate appraiser that the Court qualified as an expert, opined that the value of the 31 remaining fully developed lots pledged to LANB as of December 5, 2012, if sold in bulk, was $3.55 million. His expert report reflects delinquent property taxes of about $331,000. The Trustee testified that she estimated LANB would have a deficiency claim of approximately $5 million after a sale of its collateral in the Foreclosure Action.

The Debtor testified in great detail about the damages he suffered from LANB's actions, including lost profits from the sale of the collateral pledged to LANB and to GL. He testified about retail lot values and expected lots sales had LANB granted the New Loans and profits from those sales, backed by historical and current sales prices and information relating to operating costs. The Debtor opined that he suffered at least $31 million in damages.

The Debtor commenced the Fraudulent Transfer Action on October 26, 2011. He seeks

to recover $974,868.61 from LANB. The Debtor alleges that he paid $974,868.61 more than what was required to obtain lien releases upon the sale of lots within the four year period preceding commencement of his bankruptcy case and did not receive reasonably equivalent value in exchange for such payments.

THE SETTLEMENT AGREEMENT

In February, 2013, the Trustee, High Summit Corp2., South Summit C., and LANB entered into a settlement agreement. The parties amended and restated the settlement agreement in an Amended Settlement Agreement dated May 6, 2013 (hereafter the "Settlement Agreement"). Under the Settlement Agreement,

1.	The Trustee will stipulate to a foreclosure judgment in favor of LANB, and will cooperate with LANB so it may complete its foreclosure sale against the Santa Fe Summit property pledged to it.

2.	LANB will receive the $395,119.58 held in escrow.

3.	LANB's deficiency claim against the estate will be limed to $2 million plus all funds expended by LANB on property taxes for Santa Fe Summit. The deficiency claim will not be reduced for by amount to be distributed to LANB from the escrowed funds.

4.	LANB will pay to the Trustee the total sum of two hundred twenty-five thousand dollars ($225,000) within fifteen calendar days of closing of the settlement.

5.	The Trustee will cooperate with LANB for it to obtain any necessary approvals of the City of Santa Fe ("City") relating to Santa Fe Summit, including approvals of subdivision plats, at LANB's sole expense.

6.	The Trustee will transfer without warranties of title any and all ownership interest and/or rights held by the bankruptcy estate in the common areas, common elements, easements, licenses, profits, leases, contracts, and entitlements to the extent they are located within the Summit Properties, South Summit, High Summit, High Summit III or which is owned by Brutsche, South Summit or High Summit to the High Summit Homeowner's Association ("HOA"). If HOA

---

[2] The Trustee has a motion pending to declare that she has control of both High Summit Corp. and South Summit Co. by virtue of the estate's ownership of majority interests in those corporations. The settlement agreement is contingent on a favorable ruling on those matters.

declines to accept some or all of the property, that property will be transferred to LANB.  In exchange, LANB will pay to the Trustee the additional sum of $12,500.

7.    If the Trustee settles her litigation with the City, she will attempt to require the City to provide water to Santa Fe Summit as part of the settlement.

8.    If the Trustee settles her litigation with the Nature Conservancy, the Trustee will attempt to ensure as part of the settlement that any resolution of the litigation results in the subject property remaining as open space.  If the property is not retained as open space, the Trustee must provide LANB the option of purchasing the property at its fair market value.

9.    The Trustee will dismiss the Fraudulent Transfer Action against LANB.

10.   The parties will give each other a broad, unconditionally mutual release.

## DISCUSSION

To minimize litigation and expedite the administration of a bankruptcy estate, "[c]ompromises are favored in bankruptcy."  9 Collier on Bankruptcy & 9019.03[1] (15th ed. 1993).  Fed.R.Bankr.P. 9019(a) allows a court, after notice and a hearing, to approve a compromise or settlement of a claim belonging to the bankruptcy estate, including a debtor's cause of action against a third party.

The party seeking approval of the settlement must show that the proposed settlement is fair, equitable, and in the best interests of the estate.  *See In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987) (collecting cases).   The proposed settlement does not need to represent the best possible outcome.  *Tri-State Fianncial, LLC v. Lovald,* 525 F.3d 649, 654 (8th Cir. 2008).  Rather, "the court need only determine that the settlement does not fall below the lowest point in the range of reasonableness."  *Id.*[2]  In assessing whether the proposed settlement fits

---

[2] *See also In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 636 (1st Cir.2000) (noting that the bankruptcy court must determine whether the trustee's actions are "within the universe of reasonable actions," not whether pressing onward might produce more funds); *In re Summit Metals, Inc.,* 2012 WL 1302597, *2 (3rd Cir. 2012) (affirming the bankruptcy court's finding that a "proposed settlement falls above the lowest point in the range of reasonableness"); *In re Holly Marine Towing, Inc.,* 669 F.3d 796,

within the range of reasonableness, the court must consider: "(1) the probable success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; (4) and the interests of creditors in deference to their reasonable views." *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997); *In re Edwards,* 1992 WL 84354, *3 (10th Cir. 1992) (listing the same factors).[3]

The decision to approve a settlement must be "an informed one based upon an objective evaluation of developed facts." *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989). However, the Court is not required to conduct a mini-trial on the issues upon which the settlement is predicated, nor does it need to decide all of the legal or factual questions raised by the parties. *See In re Servisense.com, Inc.*, 382 F.3d 68, 71-72 (1st Cir. 2004) ("[T]he responsibility of the bankruptcy judge… is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.").[4] If the ultimate outcome of litigation is uncertain for both parties to the settlement, compromise may be an appropriate solution. *In re Endoscopy Center of Southern Nevada, LLC*, 451 B.R. 527, 551 (Bankr. D. Nev. 2011); *Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir. 1972) (noting that uncertainty in the law suggests that settlement agreements should be approved to avoid the uncertainty of litigation).

---

801 (7th Cir. 2012) ("If the proposed settlement falls into the reasonable range of possible litigation outcomes, then it will pass the best interests [of the bankruptcy estate] test.") (internal quotations omitted); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir. 1983), *cert. denied*, 464 U.S. 822 (1983) (same).

[3] Most circuits apply similar factors. *See, e.g., In re Yacovi*, 2011 WL 924244, *3 (1st Cir. 2011) (setting forth factors similar to those listed in *Kopexa*) (same); *In re Martin*, 91 F.3d 389, 393 (3rd Cir.1996) (same); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010); *In re MQVP, Inc.*, 2012 WL 1233019, *3 (6th Cir. 2012) (same); *Tri-State Financial, LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008) (same); *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1594 (11th Cir.1990) (same).

[4] *See also In re Dennett,* 449 B.R. 139, 145 (Bankr.D.Utah 2011) (noting that "[t]he Court is not required to hold a mini-trial on the issues involved in the case being compromised."); *In re Southeast Banking Corp.,* 314 B.R. 250, 272 (Bankr.S.D.Fla. 2004) ("[I]n ruling on … [a motion under Rule 9019], the Court does not … decide the ultimate factual and legal issues underlying the settled disputes.").

The Debtor contends that, in evaluating the probable success on the merits, the Court should multiply the estimated recovery if the Trustee were to prevail by the percentage of the likelihood the Trustee will prevail. Under this approach, for example, if the Trustee has a 20% chance of recovering $30 million, a reasonable settlement amount should be close to $6 million. This argument is unavailing. The Court need not conduct a mini-trial or assign a percentage to the probability that the Trustee would prevail in recovering an estimated amount. The Court should approve a settlement under Fed.R.Bank.P. 9019 if the proposed settlement does not fall below the lowest point in the range of reasonable outcomes.

*I. Standing*

As an initial matter, LANB contends that the Debtor lacks standing to object to the proposed settlement agreement. To have standing, a debtor must have a financial interest in the outcome of the proposed settlement agreement. *See In re Stinnett*, 465 F.3d 309, 315 (7th Cir. 2006); *In re Lunan*, 2013 WL 1693983, *1 (6th Cir. Apr. 2013). To demonstrate this, the debtor must show a reasonable possibility of surplus after satisfying all debts. *See In re Cult Awareness Network, Inc.*, 151 F.3d 605, 608 (7th Cir. 1998); *In re East 80th Street Equities, Inc.*, 218 F.3d 109, 116 (2nd Cir. 2000). The debtor must offer some evidence that a surplus may result, not just that there is a *theoretical* chance of a surplus. *See In re Lunan*, 2013 WL 1693983, *1; *In re Rybka*, 339 B.R. 464 (Bankr.N.D.Ill. 2006).

Filed claims in the Debtor's case exceed $17 million. Thus, to have standing to object to the proposed settlement, the Debtor must demonstrate a reasonable possibility that the Trustee would bring more than $17 million into the estate by liquidating assets and litigating his crossclaim to judgment.

It is possible for a debtor to demonstrate a reasonable possibility that the estate is solvent

based on litigation claims, while at the same time failing to show that a settlement is unreasonable. Here the Debtor presented extensive evidence on both liability and damages on the Trustee's claims against LANB. The Court concludes that the Debtor has shown a reasonable possibility that the estate is solvent, and therefore has standing.

## II. Application of the Kopexa Factors

As stated above, in assessing whether the proposed settlement falls within the range of reasonableness, the court must consider: (1) the probable success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; (4) and the interests of creditors in deference to their reasonable views. After applying these factors, the Court concludes that it should approve the settlement.

1.   Probable success of the underlying litigation on the merits.

This factor supports approval of the settlement. The Trustee was appointed after discovery closed in the state court action and the time had expired to designate experts, and within a few months of trial on LANB's foreclosure claim and the Debtor's (and now the Trustee's) cross claim against LANB. The Trustee determined the Debtor had not taken adequate discovery. The Debtor had not designated any experts. Proof of damages required expert testimony. The Trustee could not find anyone willing to take the case on a contingent fee basis. There was a pending motion for summary judgment. The Trustee determined she was not in a position to respond to the motion. The Trustee filed a motion to reopen discovery and continue the trial. The state court has not yet ruled on the motion. It is unclear whether the state court will grant the motion if the settlement is not approved. These circumstances substantially enhance the risk of an adverse judgment against the estate.

Apart from the enhanced risk to the Trustee due to the procedural posture of the

Foreclosure Action, the Trustee faces a substantial risk of an adverse judgment on the merits.

The Debtor's crossclaim against LANB in the Foreclosure Action contains eleven counts.

Those counts are predicated upon the Debtor's allegations that LANB: (1) breached an

agreement to make the New Loans; (2) misrepresented that it would make the New Loans; (3)

wrongfully informed Mr. Emery that the Debtor's existing loan was classified; and (4)

wrongfully failed to loan the Debtor 75% of the appraised value of the sound stage property.

Based on this alleged wrongdoing, the Debtor asserts claims for breach of contract, including

breach of the implied covenant of good faith and fair dealing, violation of the New Mexico

Unfair Trade Practices Act, negligent misrepresentation, constructive fraud, fraud, promissory

estoppel, breaches of fiduciary duty and a duty of confidentiality, interference with contractual

relations, and prima facie tort. The Debtor seeks actual and punitive damages in excess of $31

million.

> A. *Claims based on an oral contract, promise,*
> *or representation to lend money*

The main focus of the Debtor's crossclaim is LANB's alleged failure to perform under an

oral contract to loan money and/or to loan money as represented or promised. The Debtor

contends that LANB's CEO, Mr. Enloe, promised and/or represented that LANB would convert

an exising $9.6 million line of credit note to a term note and provide new financing of

approximately $5.7 million to pay off a prior mortgage on part of the property and for the

development of the subject property and subsequently failed to do so. He also contends that

LANB orally agreed to loan $1.35 million in connection with the sound studio and that, two days

before closing, it only agreed to lend him $700,000.

It is at least as likely as not that the claims under Count 1 (negligent and/or intentional

misrepresentation and breach of implied covenants), Count 2 (violation of the Unfair Practices

Act), Count 3 (promissory estoppel), Count 4 (breach of contract), Count 7 (breach of fiduciary duty), Count 8 (fraud and constructive fraud), Count 9 (prima facie tort), Count 10 (breach of the implied covenant of good faith and fair dealing, and Count 11 (punitive damages) would be denied based on the New Mexico Lender Liability Act. Under New Mexico's Lender Liability Act ("NMLLA"), any contract to lend more than $25,000 must be evidenced by a writing signed by the lender. That statute provides, in relevant part:

> A contract, promise or commitment to loan money or to grant, extend or renew credit or any modification thereof, in an amount greater than twenty-five thousand dollars ($25,000), not primarily for personal, family or household purposes, made by a financial institution shall not be enforceable unless in writing and signed by the party to be charged or that party's authorized representative.

N.M.S.A. 1978 § 58-6-5.

Lender liability statutes such as the NMLLA were enacted in response to a dramatic increase in the number of lawsuits brought by borrowers against banks during the 1980's. *See* John L. Culhane, Lender Liability Limitation Amendments to State Statutes of Frauds, 45 Business Lawyer 1779 (1990). The principal aim of the statutes was to eliminate claims stemming from alleged oral credit agreements. *See generally* Todd C. Pearson, Limiting Lender Liability: The Trend Toward Written Credit Agreement Statutes, 76 Minnesota Law Review 295, 302 (1991).

The Debtor contends that, notwithstanding the NMLLA, the Trustee can assert various claims for misrepresentation and breach of an oral agreement under the theories of breach of fiduciary duty, negligent misrepresentation, fraud, constructive fraud and violation of the Unfair Trade Practices Act. It is unlikely that the Trustee would prevail on these claims. If the Trustee were permitted to assert such claims on the basis that LANB refused to honor its oral promise or representation that it would loan money, it would thwart the intent of the legislature and render

the NMLLA meaningless.

The Debtor also asserts promissory estoppel.  There is a split in authority as to whether a party may rely on that theory to escape the writing requirement under statutes such as the NMLLA.[5]  To date, no New Mexico appellate court has addressed this issue.  Based on the split in authority and the statutory language, however, the Trustee faces a risk that a New Mexico court would determine that the NMLLA bars the Debtor's (and now the Trustee's) claims against LANB based on promissory estoppel.  That risk is particularly substantial where the alleged agreement or promise is not simply to make an annual renewal of an existing loan, consistent with past practice, but is to loan $5.7 of new funds in addition to an approximate $10 million outstanding loan balance at a time when the borrower was in financial trouble.

Further, even if the state court allowed the Trustee to proceed under an estoppel theory, it does not appear likely that she could satisfy the reasonable reliance requirement of that cause of action insofar as the claim is based on failure to make the New Loans.  *See Magnolia Mountain Ltd., Partnership v. Ski Rio Partners, Ltd.*, 139 N.M. 288, 295-296, 131 P.3d 675, 682-683 (Ct.App. 2005) (To prevail on a claim for promissory estoppel, "the promisee's reliance on the promise must have been reasonable.").  Given his experience and sophistication, the state court very well could find that it was not reasonable for the Debtor to have relied on LANB's alleged representations and promises regarding the New Loan Package.  Each previous note the Debtor signed included a conspicuous disclaimer regarding the NMLLA writing requirement.  The

---

[5] For example, *compare The Mark Andrew of the Palm Beaches, LTD. v GMAC Commercial Mortgage Corp.*, 265 F.Supp.2d 366, 382 (S.D.N.Y. 2003) (Determining that "Florida law prohibits a party from recovering through a claim of promissory estoppel what they are otherwise prohibited from recovering by [a statute requiring a writing]."); *Jesco Construction Corp. v. Nationsbank Corp.*, 830 So.2d 989, 992, 2002-0057, at *4 (La. 2002) (finding that the lender liability statute prevented the borrower from asserting equitable theories such as estoppel)*with Smith v. Keystone Mortgage Services Corp.*, 1991 WL 288133, at *2 (Conn.Super. 1991) (allowing a party to use the doctrine of estoppel to circumvent the statute of frauds).

Debtor was aware that loan committee approval was required on all prior loans that LANB granted him, and he knew that Mr. Enloe had not obtained committee approval for the New Loan Package. Further, the New Loan Package purported to increase the Debtor's credit line by 50%, or more than $5 million, at a time when he was experiencing financial trouble. Thus, the state court could very well find that the Debtor could not have reasonably relied on Mr. Enloe's oral representations.

In addition, the Trustee faces a substantial risk that she could not prevail under an estoppel theory predicated on LANB's refusal to renew the revolving line of credit feature of his loan. There is no evidence LANB affirmatively represented it would not terminate the revolving nature of the credit in August 2009. According to the Debtor, LANB advised him in late January 2009 that the FDIC had instructed LANB to terminate his revolving line of credit. The FDIC was requiring LANB to classify the loan. The Debtor's financial condition had deteriorated as a result of the recession and his cessation of marketing activities in connection with the aborted sale to Mr. Hudgins. LANB terminated the revolving feature of the line of credit in mid-August 2009 as part of the annual loan renewal. Under these circumstances, the Trustee faced a substantial risk that she would not prevail under this theory.

Further, it is unclear whether the Trustee would recover any substantial amount on an estoppel claim based on the sound studio loan. The Trustee believed that this claim was somewhat stronger than the claims based on the New Loan Package, likely because the Debtor leveraged his house to obtain the loan. It is unclear from the evidence how much damages, if any, the Debtor suffered as a result of LANB's failure to loan the entire amount promised ($1.35 million) rather than the $700,000 actually loaned.

*B. Claims based on LANB's disclosure to Emery*

Counts 5, 6, and 7 of the Debtor's crossclaim are based on LANB's alleged wrongful disclosure of confidential information to a potential investor. The Debtor contends that LANB wrongfully disclosed information regarding his financial condition and the subject loan to Mr. Emery and that the disclosure caused the prospective investor not to invest in the Debtor's project.

The Debtor asked LANB to meet with Mr. Emery so that LANB could consider making a loan to his client to enable the client to invest money into the Santa Fe Summit development. Further, at the Debtor's request, Mr. Enloe provided information to Mr. Emery regarding the project in connection with the due diligence Mr. Emery was conducting for his client. Under New Mexico law, the Debtor very well may have waived his right to confidentiality when he directed LANB to disclose certain information to Mr. Emery. *See R.A. Peck, Inc. v. Liberty Federal Savings Bank*, 108 N.M. 84, 90-91, 766 P.2d 928, 934-35 (Ct.App. 1988) (noting that in certain "instances, a customer, through some action, will be found to have waived the right to confidentiality, in which case the bank's duty to the customer would be deemed extinguished"). Moreover, once LANB disclosed some information, it may have had a duty to disclose other material facts regarding the Santa Fe Summit development to an investor performing due diligence. *See id.* (noting that "a bank may find itself in a situation where … it may be held liable to a third party for its failure to disclose information about a customer's accounts").

It appears at least as likely as not that a court would find that LANB's actions were appropriate under the circumstances. The claims stemming from LANB's allegedly wrongful disclosures to Mr. Emery include Count 5 (negligence, breach of confidentiality), Count 6 (interference with contractual relations), and Count 7 (breach of fiduciary duty).

C.    *The Escrowed Funds*

The Debtor argues the proposed settlement is not reasonable because the Trustee is likely to prevail on a claim to the $395,119.68 of sale proceeds being held in escrow.  Prior to the eruption of this dispute, LANB accepted payment of a percentage of the sale price to release the line of its mortgage against lots in accordance with the partial release provisions of the Construction Loan Agreement and a schedule specifying the release price for each lot.  After LANB declared the then outstanding renewal note in default, it refused to release its lien against Lots 15 and 25 upon payment of the release prices for those lots.  To enable the sales to close, the Debtor and LANB agreed to place $395,119.68 of proceeds in escrow pending a determination whether the Debtor was entitled to lien releases as to those lots upon payment of the release prices.  LANB contends that because those lots were sold after the Debtor defaulted, the Trustee therefore is not entitled to the escrowed funds.  The Debtor disagrees.

Paragraph 10.F of the Construction Loan Agreement, pursuant to which LANB granted partial releases for subdivision lots, provides that LANB will release subdivision lots from its lien upon certain conditions.  Under subpart (2), one of those conditions is:  "[n]either any Guarantor nor I [referring to the Debtor] are in default with respect to any obligation to you [LANB], of any type, nature or kind."  There is ample evidence to support a finding that the Debtor was in default on his obligation to pay LANB prior to closing of the sales of Lots 15 and 25.  There is therefore a very substantial risk that a court would find that LANB, not the Trustee, is entitled to the escrowed funds.

D.    *The Fraudulent Transfer Claim*

The Settlement Agreement also resolves the Fraudulent Transfer Action the Debtor commenced to recover $974,868.61 from LANB.  Between August 28, 2007 and April 16, 2010,

the Debtor allegedly paid $974,868.61 more than what was required to obtain lien releases upon the sale of lots within the four year period preceding commencement of his bankruptcy case and did not receive reasonably equivalent value in exchange for such payments. *See* Complaint, ¶ 20, in Adversary Proceeding No. 11-1187 (Docket No. 1). The Debtor made $97,458.52 of the alleged overpayments after LANB terminated the revolving line of credit feature when it renewed the Debtor's note in August 2009. All of the alleged overpayments occurred before LANB declared the loan in default.

By paying more than what was required to obtain lot lien releases, the Debtor paid down his indebtedness to LANB by the amount of the overpayment. "[A] debtor receives 'value' for a transfer if the transfer satisfies a claim [or debt] the transferee-creditor has against the debtor." *In re Hedged-Investments Associates, Inc.*, 84 F.3d 1286, 1289 (10th Cir. 1996). Although the Tenth Circuit has not weighed in on the matter, a number of courts have held that "a dollar-for-dollar reduction in debt constitutes-as a matter of law-reasonably equivalent value for purposes of the fraudulent-transfer statutes." *In re Southeast Waffles, LLC*, 702 F.3d 850, 857 (6th Cir. 2012). As one court pointed out, a dollar-for-dollar reduction in debt is not merely reasonably equivalent value, but is actually "perfectly equivalent value*." In re All-Type Printing, Inc*., 274 B.R. 316, 324 (Bankr.D.Conn. 2002).

The Court therefore concludes it is quite unlikely the Trustee would prevail in the Fraudulent Transfer Action.

2      The possible difficulty in collection of a judgment

The parties agree that the Trustee could collect a judgment because LANB is a solvent bank. However, LANB has a claim against the estate exceeding $10 million. As a result, the Trustee would need to recover more than this amount, net of litigation costs, to net any recovery

for the estate.  That prospect is low.  This factor therefore favors the settlement or is neutral.

      3.      <u>The complexity and expense of the litigation</u>

This factor supports approval of the settlement.  The matters at issue in the crossclaim are complex.  The Court heard two full days of evidence on the motion to approve the settlement.  A full trial would have taken substantially longer.  The Trustee estimated the cost of retaining an attorney on an hourly basis would be $250,000 to $750,000 depending on whether the state court reopened discovery, continued the trial, and permitted the Trustee to designate experts.  She could not find an attorney willing to take the case on a contingent fee basis.  It appears that the Trustee did not have sufficient funds to enable her to pay an attorney to represent her in the Foreclosure Action on an hourly basis.[6]

      4.      <u>The interests of creditors in deference to their reasonable views</u>

This factor supports approval of the settlement.  Under the settlement, LANB will pay the Trustee $237,500.  If the matter does not settle, the Trustee has a very significant risk of no recovery, and out of pocket expenses of $250,000 or more in litigation costs if she survives summary judgment assuming there are estate funds to retain and pay counsel. Although the only parties in interest expressing a preference on the settlement was LANB, the litigation target, and the Debtor and his spouse, no other creditors objected to the motion to approve settlement despite having an opportunity to do so.

CONCLUSION

Based on the foregoing, the Court concludes that the settlement falls within the range of

---

[6] Following conversion of the Chapter 11 case to Chapter 7 on June 8, 2012, the Debtor filed a schedule of unpaid post-petition debts incurred during the Chapter 11 case, as required by Fed.R.Bankr.P. 1019(5)(A).  *See* Docket No. 278.  The schedule reflects unpaid administrative expenses totaling $462,274.48, including $294,665.08 owed to the Debtor's bankruptcy counsel and his accountants.  The most recent monthly operating report on file, for the period ending April 30, 2012, reflects total cash on hand at the end of the reporting period of less than $2,000.  This suggests that the Trustee did not have sufficient funds to pay an attorney to represent her in the Foreclosure Action on an hourly basis.

reasonableness and should be approved.  The settlement is fair, equitable, and in the best

interests of the estate.  The Court will enter a separate order approving the settlement agreement.


ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: October 15, 2013

COPY TO:

Sam Roybal
500 Marquette Ave NW Ste 650
Albuquerque, NM 87102-5309

Ralph Leo Brutsche
P.O. Box 1828
Santa Fe, NM 87504

Ann Washburn & Dave Giddens
10400 Academy Road NE, Suite 350
Albuquerque, NM 87111

Eric Nicholas Ortiz
P.O. Box 40489
Albuquerque, NM 87196

Yvette J. Gonzales
P.O. Box 1037
Placitas, NM 87043-1037

Bonnie Bassan Gandarilla
3800 Osuna Rd NE, Suite #2
Albuquerque, NM 87109

Chris W Pierce
2632 Mesilla St. NE
Albuquerque, NM 87110